Number 181248, James Haidak v. UMass-Amherst et al. May it please the Court, Luke Ryan on behalf of the Plaintiff Appellant James Haidak, I'd like, with the Court's permission, to reserve two minutes of my time for rebuttal. You may. At its core, this is a case about the process that was used to resolve a fairly simple factual dispute. Did James Haidak use his hands to grab Lauren Gibney's wrists in an unsuccessful attempt to prevent her from striking him in the face, or did James Haidak grab Ms. Gibney's wrists for purposes of using her fists to strike himself in the face? Now Ms. Gibney's claim that Mr. Haidak, in effect, used his face to assault Ms. Gibney's fists was something that Dean Allison Berger had never heard in her years adjudicating conduct cases. And when she heard Mr. Haidak's version of events, she gave serious consideration to the idea that this young man might have been the actual victim of intimate partner violence. In spite of this, Dean Berger and her colleagues adopted and implemented a series of procedural devices that were arbitrary and improperly stacked the deck against Mr. Haidak and recklessly increased the odds of an erroneous deprivation of his right to pursue an education. It's our contention that this process was flawed from beginning to end. I'd like to start at the end, or near the end, with the hearing that Mr. Haidak finally had on November 22nd. All the dates I'm going to refer to are in the year 2013. Now as our briefs make clear, by the time that this hearing took place, the university had stopped permitting students like James Haidak to directly question their accusers and adopted what Judge Simon has referred to as the stilted method of requiring students who want to have a voice in questioning their accusers to pre-submit questions so that a hearing board can then pose the ones that they deem relevant. Is there anything in the record to indicate why the change was made? There isn't, Your Honor. I think that if you look at the context, this is 2013, the Dear Colleague letter that the Office of Civil Rights issued in April of 2011 had discouraged this, and I think that within a couple of years, the movement across the country had been to move away from what had been a basic right that I think most students throughout the country had enjoyed, which was this right of direct confrontation. But there's nothing in the record that suggests that this change was made to get James Haidak. In any event, it's a... Is there anything in the record to reflect... I know he asked that they ask more questions than they asked in several subject matter areas, which I think you'll talk about. But is there anything in the record to indicate that he attempted to assert or requested to or objected to not being allowed to ask the questions himself? No, Your Honor. By the time that he finally got his hearing, I mean, he objected throughout about the time that it took to get the hearing, but he was given the procedures that the university was using in the fall of 2013, and he played by the rules that had just been changed and submitted the questions. It's our contention that that change rendered, given the stakes of the hearing, the competing narratives that the fact-finders had before him, that resulted in a process that was unconstitutional. As the Sixth Circuit found in the Dovey bomb, when it's a classic he said, she said, either the accused student, him or herself, or the student's representative has to have the opportunity to test and probe the credibility of the complaining witness. So that clearly didn't happen in this case, but for the delay of seven months to get the hearing, Mr. Haydick would have had this. I think that's relevant to the point of the third prong of the Matthews v. Eldridge test, which looks at whether or not the procedure that you're saying should have been followed would have placed some sort of undue burden on the university. Do you think the lack of an objection is significant? I don't, Your Honor. I think that... Why not? It gives him a heads-high-win-tails-you-lose situation. He uses the new procedure. If he wins, terrific. But if he loses, he now comes in and complains for the first time in court about the change in procedure. That's not the way things are usually done. Right, but I think if Mr. Haydick had been an attorney, that's the way that we expect litigants to proceed. This is an undergraduate who I think to be called upon to raise procedural objections is asking a bit much. So I don't think that Mr. Haydick, by playing by the rules that the university changed in the middle of the process, forfeited the ability to come back and say, hey, wait a minute, this wasn't fair. So you want us to write an opinion that says that we can vacate a university disciplinary procedural hearing on procedural grounds, even though no complaint was ever made at the time about the procedures that the university employed? Well, I... I'm just thinking of how this is going to look, applied to the university cases generally. There were, I would note, a number of objections that Mr. Haydick did raise. But on the issue of cross examination, I think that this court can and should write that opinion, that it's not incumbent upon an undergraduate student at the time to challenge procedures that are handed to him on the eve of a hearing if those procedures run afoul of the Constitution. I don't think the court needs to get there. It also goes to the whole gestalt of what's going on. Part of the reason people object, in fact, the principal reason they object isn't because they think there's some case law that holds that, but it's because they feel a need to do this. They think it's fair to do it, so it compels them to come forward and say, hey, I want to do this. When you have the absence of any indication from him that he has any objection to that manner of the proceeding going, it does undercut some the sense that it's a fundamental aspect of due process of which is being deprived. Point well taken. I think if you look at what Mr. Haydick was offered and the questions that he submitted, I don't think the court, to find for James Haydick, needs to find. I think that the case law, it is clear that direct questioning of the accuser is part of an accused student's due process rights. But in this particular case, to give him relief, I don't think you have to find that. I think you could find that this stilted method that was offered to him in the abstract could have been sufficient, but in his case, they had a procedural advisor who interjected herself as a kind of unofficial gatekeeper and pared down his list of questions from 36 to 16, and then of the remaining 16, the hearing board members asked very few. If you read the transcript of his hearing, the questions posed to misgive me, they don't read like cross-examination. It reads like a deposition, frankly. I think the reason for that, as we point out in our brief, is the university, by the time this hearing took place, was training these questioners to bend over backwards to do anything that would make the accuser feel uncomfortable or feel challenged in any way that their account wasn't being  heard. That, I think, left Mr. Haydick without the ability to, in a he-said-she-said case, have the person who was pointing the finger at him subjected to the kinds of questions she needed to be. Well, are you saying, then, that the nub of your case is that they edited out some questions? It is part of the nub of the case. Did he raise that point at the time? Well, the procedures that the university adopted the semester after James Haydick's expulsion actually allowed for charged students, at the end of the hearing, they were asked directly, is there any questions we should have asked and we didn't? They would hand them a piece of paper to write down the questions. He was not given that opportunity to be there and to hear, at the end of the hearing, to have his say as to where they went astray in terms of their questioning of Ms. Gibney. Did he attempt to object in some fashion or indicate his dissatisfaction with the fact that some of these questions had been edited out or omitted? There's nothing in the record of the transfer reflecting Mr. Haydick's objection to the questioning of the Board of Ms. Gibney. And, again, there wasn't a vehicle that was presented to him where that would have been appropriate. And, again, I think it goes to the point, again, of putting on an undergraduate student who's forced to defend himself, who doesn't have the access to an attorney, who's trying to give his account, foisting this obligation to raise these procedural objections and keep track of the questions that were and weren't asked that he had proposed. He didn't learn until discovery that the procedural advisor had made this sort of unilateral decision at the outset that only a small percentage of his questions would even be asked. Now, as I indicated in the briefs, this, he really shouldn't have been in this position because he was subjected to a seven-month delay from the time of his hearing until when he finally had his day in court. And the university, the district court judge found that this was an imminent threat and that this was warranted. If they had, upon getting a report of his harassment, immediately said, look, we need to step in here, this young man's a predator, and had done that, that would be one thing. They waited two weeks without reaching out to him, and there was no reason for that. It was not impractical. There's no excuse for it. What do you say that the procedure for a suspension was minimally sufficient because they gave him a chance to talk to the administrator by phone and file a letter? I think that we cited the Dovey University of Cincinnati opinion that I think is right on point and explains why that is insufficient. What he needed was a hearing where Ms. Gibney would come in and be forced to testify. And I think if you look at what actually happened when she had to show up and give testimony, she recanted this idea that this contact had been anything but voluntary. I think what he was given was totally insufficient after a pre-deprivation that did not need to occur without him receiving any kind of notice. Now I wanted to say one more thing about cross-examination, and I think I'll probably use my two minutes at the end to talk about Title IX. The essence of cross-examination is listening to what the witness testifies to. When you have this stilted method that requires pre-submission of questions, you're essentially asking the accused students to be clairvoyant, to think about what is my accuser going to say. It totally deprives students from the opportunity to do one of the most powerful things that I think we all see in the transcripts that we read when advocates impeach witnesses with prior inconsistent testimony. Mr. Hiddick had no way to, in real time, show that Ms. Gibney was in no way, shape, or form telling the same story twice. Thank you, Mr. Ryan. Good morning, Your Honors. My name is Denise Barton. I'm with the Office of the General Counsel for the University of Massachusetts, and I represent the University of Massachusetts Amherst and its four Dean of Students employees, Angu Gulai, David Valancourt, Patricia Cardozo, and former employee, Allison Berger. This case has two primary issues. Well, before you get to your two primary issues, can we start with a question Judge Kaye uttered to us near the end of Mr. Ryan's presentation, which is troubling me, and that is the suspension of the point of Hiddick and the process, or lack of process, that accompanied it. Certainly, Your Honor. Mr. Hiddick had been issued two prior no-contact orders concerning reaching out to Ms. Gibney. He violated Order 1, he violated Order 2. He then violated, when he violated Order 2, the University realized, like the court did in the Medlock v. Trustees of the University of Indiana case, that this was in your face flagrant violation of the University's rules, and it issued an interim suspension after looking into it. It afforded Mr. Hiddick, who was not in Amherst, but was at his parents' home in Potomac, a hearing telephonically with the dean within two days. The interim suspension was issued on June 17th. The telephonic hearing took place on June 19th. Mr. Hiddick was invited to explain and defend and provide his side of the story, as Gorman and Goss and Dixon have counseled us to do since the 1960s, when it comes to affording due process in a disciplinary setting at a public university. Mr. Hiddick took Dean Berger up on an invitation and on July 5th provided a lengthy discussion as to why he felt that it was okay that he violated the no-contact order because the contact was consensual. In short, he admitted that he violated the no-contact order. Dean Berger reviewed that, she reviewed his letter, and on August 5th that she would continue the interim suspension. Assume here that the university learned in a hearing held in July or June, which one wasn't held, but it learned that she had falsely accused him, he had done nothing wrong to her, and she had welcomed all of the contacts, so that the no-contact order itself was premised on a false accusation, and that during the no-contact period all contact was consensual. I find it hard to believe that the university would then have suspended the student for seven months. Let me back up. The suspension, first of all, was June to November, so it's not seven months. The original contact underlying the entire thing took place on April 16th. The university learned about it a day or two afterwards. June to November. Several months, and unfortunately over the summer, which admittedly... In virtually most of the semester of school. Yes. Pretty serious sanction. He did. But ultimately the outcome was that he was found responsible, and it wasn't just on the violation of the no-contact... Could you get to my question? Pardon me? Could you answer my question? Yes, Your Honor. I don't know what the university would have done because that is not what happened. And isn't that the problem? Is that neither he nor we knew you know what would have happened had there been an adversary hearing of some type in June or July where he could have presented and potentially convinced someone that he never assaulted her, she assaulted him, and all contacts were consensual? I think there's two different pieces to your contact orders, and you're asking would hypothetically the university have even proceeded with those charges had it been in possession, which it was not until September, of information that this was all consensual. I don't know the answer to that. But there is a second part to your question, which is if the hearing had occurred sooner, what about the assault piece? The assault piece was heard eventually, and he was found responsible for the assault piece. Photographs of the bruises on her biceps, photographs of the bruises on her wrists were submitted before the hearing board. The appendix contains a lengthy discussion of the evidence that was before the hearing board in November from its appendix 1600 to 1636, and it explains very clearly the back and forth that was given, including the questions that Mr. Haydack wanted to ask. And I would point out, you asked some very interesting questions about why didn't he object, and my brother attorney said because there was no provision for it. Well, even though Mr. Haydack was not under criminal process, which the university allows counsel to be present when there's contemporaneous criminal process going on, Mr. Ryan, his now counsel, was present during that hearing. In addition, he had a judicial advisor through the university named Stacey Levin, who was also very involved in the process. And although it hasn't been an issue in the briefing in answering your question about could an objection have been raised, sure, the board would have taken into consideration, the procedural advisor would have taken into consideration whether or not to ask more questions. It is a little bit different than a trial because you have this rule that prohibits him from bringing a lawyer to the hearing. No, we don't. I thought you did. We have a rule that prohibits, it's a rule that prohibits the lawyer from taking an active role in the hearing. Okay, so he can come as a part of the plan, but not as a participant. Yes, and they were actually, since Mr. Haydack scheduled the hearing on a date when he had to work in Potomac, Mr. Haydack appeared remotely by video and was texting or Skyping or something to that effect with at least the judicial advisor. I'm not sure if he had that same interplay with Mr. Ryan during the hearing. Well, if the counsel that he had was basically a part of the plan, is it your position that, in fact, Mr. Haydack has forfeited his claim by not raising it himself? I haven't thought about it that way, Your Honor. I have been thinking about this in a very different way, which is cross-examination has never been an essential requisite of due process in either the First Circuit or in any other jurisdiction, with the exception recently of the Sixth Circuit. If that is so, doesn't it behoove someone who wants to make a change in such long-standing procedure to say, I want you to make a change because this violates what your current procedure omits, a critical element, and that omission amounts to a violation of due process. Doesn't it behoove him to raise it in some fashion? I think it does, Your Honor, and I think that's exactly what we're looking at with the Department of Education OCR right now. They've submitted for notice and comment, and universities have been commenting on this over the holiday break of the universities. I believe notice and comment period closes at the end of January on exactly that. And part of what they're asking disciplinary processes to include is cross-examination, which obviously proves the negative, it's not required now. In the Sixth Circuit, the case that he cited, which is the – I apologize – it essentially allowed for the exact same procedure that we did here, which was the submitting of questions to a panel. It's the Doe v. University of Cincinnati case. It's a 2017 case out of the Sixth Circuit. And although the Sixth Circuit stressed the importance of cross-examination, it did not strike down the University of Cincinnati's policy of authorizing a circumscribed form of cross-examination that, quote, involves submitting written questions to the panelists. So while I understand the desire and the need to have a fairer process, it is something that the university takes very seriously. But it is not tantamount to a criminal court. It's not tantamount to a civil trial. The literature on this is deep and wide and dates back to the 1960s. But at the end of the day, the accused is entitled to know what he's been charged with or she's been charged with. And have an opportunity that is afforded by the university to answer, to explain, and defend. Isn't the accused also entitled to a reasonably prompt hearing? It says, at a meaningful time and in a meaningful manner. But it seems to me that a meaningful time means reasonably prompt. Under the circumstances, and I cannot stand up here and say that I think it's terrific that it took that long. I don't think it is. But at that point in time, hearings were not being held when school was not officially in session. That was remedied, not because of Mr. Haydack, but because we felt that was important. At the time, that was a choice of the university. That was not anything that we can attribute to Mr. Haydack. It wasn't a choice to, no, we cannot attribute it to Mr. Haydack. You're absolutely correct. But it was the circumstances. And if we find that he was owed a reasonably prompt hearing and didn't receive one, what should we do with that finding? Well, I think you can do a couple of things. And that is why I raised the alternate grounds of sovereign immunity and qualified immunity. Yes, but you didn't raise those in the district court. Sovereign immunity was raised in the district court and can be raised at any time. Yeah, but you've got to think of qualified immunity. Qualified immunity, actually, contrary to what is stated in the reply brief, it's discretionary within this court as to whether or not to address qualified immunity. There is a Supreme Court case called Singleton v. Wolf, which is cited within Cox v. Glantz, a Tenth Circuit case that was cited by the appellant. And it says the matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the court of appeals to be exercised on the facts of individual cases. I submit here that looking at the pleadings on their face, everything that occurred here is pleaded as if happened in the university employee's official capacities. Not one thing contained in the entire second amended complaint, which is the operative pleading here, speaks to anything that is done in their individual capacity. And while I recognize the appellant's counsel's argument that this makes it somewhat challenging to reply to something for the first time on appeal, that's not the case. The court still has to determine whether something was constitutional. And that is the exact same inquiry that we make in a qualified immunity case. Did the person act in disregard of a known constitutional right, something that they knew or should have known about? And I submit here, cross-examination, not a known constitutional right. While aspirational and while currently under consideration by the Department of Education, our case law, Goss, Gorman. What about suspending someone for five months without any hearing, where the key thing hinges on credibility? He was suspended for violating the university's directive, not for the assault that ultimately was heard in November. Then you're talking about suspending five. That directive, I can't imagine that the university, upon discovering that the directive was the result of a false accusation, I can't imagine the university would then say five months suspension is the proper period of time, particularly where the directive itself was predicated on the belief that the accuser wanted it. I don't think the accuser wanted all of it. And I think that becomes very clear in the later conversations in which the police had to get involved, in which he said... I wanted the suspension. In other words, the suspension was predicated in some extent on hearing the story from the parents. And as the university itself learned, there turned out to be quite a few differences between what the parents understood the facts to be and what the accuser understood the facts to be. You're correct, Judge Kayada, but we're forced to deal with the facts that we're presented with. Well, you're forcefully at a hearing. That's why we have a hearing, so you have more facts. I agree with you concerning the interim suspension piece, but I cycle back to the fact that despite knowing, and the board was fully aware that these contacts were consensual, I invite you to read the hearing transcript from Appendix 1600 to 1636. She admits that they were consensual. They were consensual. Judge Ponzer assumed in his decision that all of the contacts were consensual. The university is still able, and the hearing board found, that he violated those no-contact orders. I think what you're saying now is that even though they didn't give him a hearing back in June or July, we know that had they given him a hearing, the result probably would have been the same. So he still would have been kicked out. That would still leave a deprivation of a procedural right, albeit the damages that are associated with it might be none. I suppose if you find that it was unconstitutional not to hold a hearing concerning that interim suspension, regardless of the fact that the outcome was likely the same, that perhaps you're in a carry FIFAS, or if I never say that case right, FIFAS situation with nominal damages, which I don't concede but recognize. Would you say, you haven't much time left, would you say something about the Title IX claim? Yes, Your Honor. In particular, address the question whether, based on the disparate impact evidence that was offered, should there not have been a trial to allow that to be explained, whether it be in the university's favor or against the university's favor? Yes, Your Honor, I understand your question, and no, I don't think there needed to be a trial. I think Title IX, no matter which formulation you use to analyze Title IX of the four formulations, including the two that are set forth in USIF, the second certain case this Court has followed, there's no particularized evidence of a material fact concerning gender bias against Mr. Haydeck. Disparate impact, there's no private right of action for disparate impact. The Wesser v. Glenn case that I cited in my brief, as well as the United States Supreme Court case in Alexander v. Sandoval, by extension from Title VI, says there's no right predicated on simply disparate impact, nor is there a Title IX claim predicated on procedural failures. You have to show, with particularized admissible evidence, that Mr. Haydeck was treated differently here because of his gender, and I submit that the experts' evidence, statistically insignificant. I know that they argue that we didn't give them everything they wanted, but we did, and we gave them exactly what we were ordered to do after two rounds of motions to compel in the federal court. They had evidence from 2010 to 2015 of university students who had been disciplined, accused of assault, the resultant discipline, and it was found that more males were expelled or disciplined severely than females. It was a very small statistical sample. The expert came to the conclusion that he could not even conclude from that that there was bias in the colloquial sense. But if there had been an exposition looking behind the mere disparate impact evidence, and it was found that, in fact, there was the kind of intentional bias that Title IX would forbid, that would be a first step in proving that what had been true in other cases was probably true in this one. It may not have been sufficient, but it would have been competent evidence to that point, and why should that not have been allowed? I understand your question, and I think what you're asking is, should this have been allowed to progress through what's been sort of imported into Title IX, the McDonnell-Douglas framework? I hadn't thought of McDonnell-Douglas. That's sort of how I think about this, but I think he fails to make his prima facie showing. There's no causation piece here, and even if he makes that prima facie showing, let's assume that arguendo and you get into the McDonnell-Douglas analysis, we come back with a legitimate reason as to why we disciplined him in the way that we disciplined him, and the record speaks on that subject. The discipline decision, as opposed to the finding of responsibility, was made understanding his past disciplinary issues that he had at the campus, and progressive discipline, like in the place of employment, is something that the university uses, and this was a young man who had, in 2010 and in 2012, months before this incident in 2013, had two fairly significant disciplinary issues. Now, granted, he accepted responsibility for those, but I go into the underlying issues about the disciplinary problems that came up in the brief. I won't take up the Court's time with that in responding to the question. Thank you. The district court found that Warren Gibney was not a similarly situated person in comparison to James Haydick and what he faced in the disciplinary system. I think the Court got it wrong. Warren Gibney, like James Haydick, was colorably accused of an assault, and like James Haydick, she violated her own no-contact order hundreds of times. Warren Gibney was not only not punished severely for either of these incidents, she never faced charges, and I think that as you look at a Title IX claim, that in and of itself, I think, was enough to get the case to a jury. If you were to engage in the thought experiment of switching the sex of these two parties, I think what you would be left with is a case that reeks of discriminatory animus. Mr. Haydick, if you had a female go to the dean of students and say, my ex-boyfriend who's responsible for this black guy I got hit me again, but he's a really good person, I don't want to see him suffer any consequences, and then six weeks later, after that boyfriend had been playing some mind games and had orchestrated that female student's suspension from the university for contacting him, and she said, at this point, I think I'd really like to have that hearing, and the dean of students said, well, you can have it once the case against you is resolved, I think that would have a flavor to it, that a jury could find that there's discriminatory animus at play. Similarly, if the dean of students said, I know you have a transcript where your ex-boyfriend admitted in court both to lying and to previously slapping you in public in what he says was a playful way, but we're not going to let your fact finders on this critical issue of first aggressor countenance this evidence, again, I think the court would be left thinking that there's something amiss here, and one of the possible explanations would be that there's a bias on the basis of the sex of the parties.  Thank you.